RTE CORPORATION, Appellant, v. COATINGS, INC., Respondent.

*No. 76–045. Argued May 2, 1978.—Decided June 30, 1978.* (Also reported in 267 N.W.2d 226.)

For the appellant there were briefs and oral argument by *Erwin Esser Nemmers* of Chicago, Illinois.

For the respondent there was a brief by *John G. Vergeront, Clifford B. Buelow* and *Davis, Kuelthau, Vergeront, Stover & Leichtfuss, S.C.,* of Milwaukee, and oral argument by *Mr. Buelow.*

HEFFERNAN, J. This is an action in which the plaintiff, RTE Corporation, claims that the defendant, Coatings, Inc., improperly took its trade secret and made use of its idea and design for an electrical connector.

RTE is a large manufacturer of electrical equipment. RTE is a member of a group known in the industry as Original Equipment Manufacturers (OEM). The OEM group comprises companies that are both customers and competitors of RTE. Coatings is a small company specializing in metallizing, coating, painting and inertia welding.

The subject matter of this suit is an electrical component called a 200 ampere connector used in a loadbreak elbow. A loadbreak elbow is a rubber, L-shaped housing used in connecting cables in underground electrical systems. RTE (and other OEMs) manufactures and sells loadbreak elbows as kits. The 200 ampere connector involved in this suit is part of the kit, and it fits inside the housing and makes the actual connection.

The 200 amp. connector is cylindrical in shape, about two inches in length, and ⅝ inches in diameter. An aluminum electric cable is inserted into a hole running lengthwise into the connector from its bottom, and the connector is crimped down onto the cable to assure good contact. On the top half of the connector is a threaded eye running perpendicular to the length of the connector. A threaded copper probe is screwed into this eye to make the connection. The general shape of these connectors has been used by RTE and other companies for years.

Until 1972, 200 ampere and similar connectors were made entirely of aluminum. Historically, the part had problems of stripped threads and distorted eyes, because the aluminum eye is soft in comparison with the copper probe. In 1972, RTE introduced a bimetallic connector, with the top half made of copper, in an attempt to solve this problem. This original bimetallic connector was assembled by screwing the male-ended copper top into the female-ended aluminum base. This connector developed problems of its own when the connector was crimped onto the aluminum cable, because the crimping tended to distort the aluminum threads of the connector, reducing the contact between the aluminum base and the copper top.

A superior method for joining aluminum to copper is inertia welding. Inertia welding is a process whereby the two pieces to be joined are rotated against one another until friction raises the temperature to a plastic state. At that time the entire surfaces of the two pieces bond together. This process results in a smooth interface and a better electrical and physical contact.

RTE claims that Coatings misappropriated RTE's idea and design for inertia welded 200 ampere bimetallic connectors. This action was commenced in Waukesha county by the filing of a summons on December 2, 1974, but was later transferred to Milwaukee county. The

complaint asserts three causes of action: (1) breach of contract, (2) trade secrets, and (3) misappropriation. These causes of action rest upon facts developed at trial showing the relationship between the parties and the sources of Coatings' knowledge of the design of the connectors.

Coatings acquired its first inertia welded machine in 1969. Coatings began soliciting the OEM group by holding an open house in 1969 to demonstrate inertia welding. Sutton, an executive of RTE, attended this open house.

During the 1969–70 solicitation, Coatings became aware of the problems in the use of all-aluminum connectors and those involved in connecting aluminum to copper in the fabrication of connectors. The technique of crimping aluminum over copper was used in other connectors prior to RTE's introduction of its bimetallic screw-type 200 ampere connector in 1972. During 1970, Coatings produced inertia welded connectors, which differed in size from the connector involved in this case, but the trial court concluded they were similar in design and function.

There were contacts between RTE and Coatings in 1969 and 1970 which made RTE aware of potential applications in its business of the inertia welded process. In 1971, in response to a phone call, RTE sent a drawing of a connector which is larger than the one involved in this case to Coatings, but there was no mention of confidentiality.

In 1972, Coatings produced several bimetallic inertia welded connectors for other members of the OEM group, in larger sizes than the size of the connector involved here.

The most significant transactions between the parties commenced on November 16, 1972. On that date, RTE sent to Coatings an inquiry with drawing attached (Exhibit 10) requesting a quoted price for inertia weld-

ments. This drawing is the one from which RTE claims its design was appropriated, but neither the drawing nor the cover letter contains any reference whatsoever to confidentiality.

During early 1973, Coatings produced for RTE two separate lots of inertia weldments. The purchase orders for these two lots, dated March 9 and April 27, 1973, each contain a printed item on the back which reads:

"Seller and buyer agree to treat as confidential all information, drawings or data received from each other with the same standard of care as each uses in connection with its own confidential information which each wishes not to be disclosed. Seller and buyer agree to return all copies of any confidential information, drawings or data upon request of the other."

On the basis of conflicting evidence, the trial court found that a copy of Exhibit 10 accompanied the first purchase order, dated March 9, 1973. RTE delivered the same drawing to at least one other inertia welding company, Flame Industries, again without any mention of confidentiality.

During this same period of time, Coatings had similar relationships with other members of the OEM group. Two other companies (Burndy and Chance) delivered drawings to Coatings of 200 ampere bimetallic inertia welded connectors, although it appears that Exhibit 10, received from RTE, was the first drawing of this type received by Coatings.

There were numerous contacts between the parties in late 1972 and early 1973, and the testimony was directly conflicting whether confidentiality was ever discussed. RTE claimed that it was, and Coatings claimed that it was not.

In October 1973, a meeting was held between the parties at which discussion was held of the idea of Coatings producing 200 ampere bimetallic inertia welded

connectors exclusively for RTE. Again, Coatings claims there was no discussion of confidentiality at this meeting. Coatings displayed its 200 ampere connector to RTE at this meeting. The meeting concluded with Coatings' request that RTE present a specific proposal.

In an attempt to standardize the part, Coatings, on October 22, 1973, created drawing No. 102273 of a 200 ampere bimetallic inertia welded connector, and sent copies of this drawing to members of the OEM group. The drawing was sent to RTE in a letter of October 24, 1973, which discussed the recently held meeting on the exclusivity proposal and also included the following language:

"We have prepared enclosed drawing #102273, showing the part we feel represents the maximum in economics and functionality based on a rather thorough survey of this market.

". . . .

"We are at this time restricting our production of these parts to rather small quantities due to our requirement for developing positive cost information."

This drawing No. 102273 is the one claimed by RTE to have been appropriated from its drawing, Exhibit 10. Coatings denies that this drawing originated from RTE's Exhibit 10.

Pursuant to a phone call from RTE, Coatings sent another letter to RTE on December 19, 1973, which stated, "Drawing #102273 shows the type of finished part we are producing . . . ."

On January 9, 1974, a meeting was held to discuss RTE's proposal that Coatings produce the connector exclusively for RTE. Coatings rejected the proposal, because it concluded that RTE's share of the market was not large enough to justify an exclusive right to Coatings' production of the 200 ampere connector.

In April of 1974, Coatings advertised in a trade publication the fact that it was producing bimetallic

inertia welded connectors. In the same month, both parties to this suit participated in a trade show in Dallas, Texas, displaying their products. Coatings featured the connector involved in this suit, and RTE also displayed and distributed samples of its inertia welded connectors. Each party saw the display of[i] the other party.

Suit was commenced on December 2, 1974. Trial was held before Judge Harvey L. Neelen on May 5–6, 1975, and Judge Neelen filed his memorandum decision on January 22, 1976, which directed the dismissal of the plaintiff's complaint on the merits. RTE moved, on February 17, 1976, for a new trial in the interests of justice and because of newly discovered evidence. RTE also moved for reconsideration. Judge Neelen denied both motions. Judgment was entered on May 4, 1976, dismissing the action on its merits.

Although the trial court stated in motions after trial that the case on the evidence could have gone either way, it is apparent from the decision that on each crucial finding of fact the issue was resolved in favor of Coatings. The trial court found that the use of bimetal connectors was generally known prior to 1969–70, and that Coatings was producing inertia welded connectors similar in design and function to RTE's 200 ampere connector in 1970.

The court found that discussions for the production of inertia welded connectors which evidenced no element of confidentiality took place between RTE and Coatings in 1971, that discussions between the parties enabled RTE to gain knowledge from Coatings of the potential for the use of inertia welding, and that by the end of 1972 Coatings had begun a program of general solicitation for the production of 200 ampere connectors.

It also found that the drawing (Exhibit 10) was submitted to Coatings in November 1972, not with an order, but with a request for price quotations. The court found

that no reference to confidentiality was included in the drawing or in the documents requesting prices.

The court found that no contractual terms seeking to impose confidentiality were communicated to Coatings until the time of RTE's first purchase order—almost four months after the drawing was sent to Coatings without provisions of confidentiality. Whether any other conversations indicated that the drawing was confidential was disputed. On this disputed evidence the trial court found that no obligation of confidentiality was ever expressly or implicitly imposed. It bolstered its finding of non-confidentiality by noting that, after the disclosure of the drawing, RTE asked that Coatings produce the 200 ampere connector exclusively for it. This request for exclusive production, in the view of the trial court, implicitly demonstrated that RTE at that time recognized that Coatings without such agreement was free to manufacture the connector for the industry generally.

Our review of the record supports the findings of the trial court. While the trial court could, with some appropriateness, state that the facts were close at trial, the facts as found are not contrary to the great weight and clear preponderance of the evidence, and on this appeal must be accepted.

Because we sustain the findings made by the trial court, affirmance of the judgment follows almost as a matter of course.

The Wisconsin law of trade secrets was set forth at length in *Abbott Laboratories v. Norse Chemical Corp.*, 33 Wis.2d 445, 147 N.W.2d 529 (1967). In *Abbott*, this court adopted the Restatement of Torts, sec. 757 (1939), as an accurate statement of the law of trade secrets in this jurisdiction. That portion of the Restatement provides:

"Sec. 757. Liability for Disclosure or Use of Another's Trade Secret—General Principle.

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

" (a) he discovered the secret by improper means, or

" (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

" (c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

" (d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."

In the case of *Gary Van Zeeland Talent, Inc. v. Sandas*, post, p. 202, 267 N.W.2d 242 (1978), of even date herewith, we have followed the rationale of *Abbott* and of the Restatement. The essence of the trade secrets tort is the inequitable use of the secret. *See, Developments in the Law—Competitive Torts*, 77 Harv. L. Rev. 888, 948 (1964).

The plaintiff must, therefore, prove improper conduct on the part of the defendant, that the information was substantially secret, that reasonable efforts were made to keep it secret, and that the defendant knew or should have known that its action was improper.

Even where a trade secret exists, the law offers no protection against a person who learns the trade secret legitimately and where no duty of confidence is imposed. Doerfer, *The Limits of Trade Secret Law Imposed by Federal Patent and Antitrust Supremacy*, 80 Harv. L. Rev. 1432, 1448 (1967) ; *Speedry Chemical Products, Inc. v. Carter's Ink Co.*, 306 F.2d 328, 330 (2d Cir. 1962).

*Abbott* restated the basic themes in the trade secret area: There must be a breach of confidence and there must be the existence of an actual trade secret. A substantially similar formulation was followed in *Smith v. Dravo Corp.*, 203 F.2d 369 (7th Cir. 1953).

It is clear, then, that trade secret law is not implicated where the subject matter or thing sought to be kept secret is a matter of public knowledge or of general knowledge within an industry. *Abbott,* at 457.

The findings of fact, which are not contrary to the great weight and clear preponderance of the evidence, demonstrate that the improved properties of the inertia welded connector were not a trade secret and certainly not secret in respect to Coatings, for Coatings repeatedly solicited inertia welding work from RTE, and the record demonstrates that it had a difficult time convincing RTE of the utility of inertia welded connectors.

To the extent that the exact shape, finish, or dimensions of the connector was crucial in affecting and improving the electrical properties, RTE failed wholly in its proof. RTE would seem to argue that Coatings could not have been the originator of the idea of the inertia welded connector, because Coatings did not employ an electrical engineer. It is apparent, however, from the record, that the claimed superior electrical properties arose primarily from the physical bond or union of the inertia weld between the aluminum and copper parts. There is no dispute that Coatings had unique expertise in the physical properties and treatment of the metals involved.

The improved electrical properties of the bimetal connecter were will known generally. No trade secret was involved in the mere knowledge that the bimetal device afforded a superior physical contact between the aluminum and copper components of the connector.

The claim that the inertia weld of aluminum to the copper parts in the connector constituted a trade secret

is also without foundation. The inertia weld for this use was Coatings idea, an idea which it had advocated for several years prior to this lawsuit. The traditional problems with the screw-type connector and the superiorty of a properly developed inertia welded connector were well known in the industry. Nor were there any peculiarities in the manufacturing process of the 200 ampere bimetallic inertia welded connector that would make that particular application a trade secret. Nothing in the proof showed that the manufacturing process for this connector was any different from any other inertia welded device.

Exhibit 10, RTE's drawing of its proposed 200 ampere connector, was the only matter arguably a trade secret involved in this case. The trial judge accepted RTE's assertion that the dimensions of the device were critical and the drawing indeed showed precise dimensions and permissible tolerances. This drawing, then, accepting RTE's assertion of its uniqueness, could properly be held to be a trade secret. The trial court held, however, that the drawing was revealed without the establishment of any relationship of confidentiality. Hence, what might have been a trade secret was not kept so. No reasonable efforts were made to keep it secret. Rather, it was disclosed to Coatings prior to the time that RTE attempted to establish any confidential relationship.

It would appear that RTE argues that the mere disclosure of the secret in the course of contracting out work imposed the confidential relationship. This is not correct. When parties are dealing at arm's length, as they were when the drawing was sent to Coatings, the disclosure of the secret does not, by that fact alone, impose a confidential relationship. Where what is thought to be a trade secret is disclosed, the question posed is whether, under the circumstances, the recipient of the information knew or should have known that the in-

formation is a trade secret and that the disclosure was made in confidence. *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 267 F. Supp. 726, 732 (S.D. Calif. 1966), *affirmed* 407 F.2d 288 (1969). A confidential relationship does not arise when the parties are dealing at arm's length and the recipient has not been put on notice of the confidential nature of the disclosure.

In the instant case, the trial court correctly held, on the proper quantum of evidence, that the drawing—the trade secret—had been revealed without any cloak of confidentiality and at a time when RTE was not even offering a contractual relationship but was merely soliciting price quotations.

The record also reveals that Coatings' solicitations in attempting to market its own version of the connector almost a year after the disclosure of the drawing were met with no protest from RTE. Moreover, after RTE's knowledge those solicitations were made, RTE proposed that Coatings produce the part exclusively for it. The trial court correctly concluded that RTE, by so doing, implicitly recognized that, in the absence of its proposed exclusive agreement, Coatings would be free to solicit the industry at large and to produce the 200 ampere bimetallic inertia welded connector for whomever it pleased.

It is apparent, even assuming that the drawing constituted a trade secret, that RTE took no adequate precautions to protect it. One who claims a trade secret must exercise eternal vigilance in protecting its confidentiality. As stated in Callmann, *Unfair Competition Trademarks and Monopolies* (3d ed. 1968), sec. 55.1, pp. 451–53:

"The courts are not favorably disposed to the trade secret owner who, even if under compelling circum-

stances, disclosed it to independent contractors or others who are not employees or partners. . . .

"Where the owner of the secret disregards caution and fails to take steps to safeguard against disclosure, the courts will, at times, deny him any relief whatever, principally on the theory that he courted his own disaster. He was 'under no obligation to disclose his plan, and could have imposed conditions and no fiduciary relationship existed between the parties.' "

It is true that the form contract which was eventually submitted to Coatings, long after the drawing was submitted to Coatings without any statement in respect to confidentiality, demonstrated an attempt to establish a confidential relationship between the parties. RTE argues that the contract, as eventually submitted, had the effect of imposing an obligation of confidence on Coatings. There are two defects in that argument. The contract clause came too late to protect the confidentiality of the drawing, which had been disclosed at an earlier time. Moreover, the contract clause in itself, even had it been timely submitted, would not be dispositive of the existence of a confidential relationship or of the existence of a trade secret, but would merely be of some weight in showing the intent to keep the secret confidential. *See, Wheelabrator Corp. v. Fogle,* 317 F. Supp. 633, 638 (W.D. La. 1970), *affirmed* 438 F.2d 1226 (5th Cir. 1971). The totality of the circumstances and the facts found by the trial court demonstrate that no confidential relationship arose between the parties.

We consider the case of *Riteoff, Inc. v. Contact Industries, Inc.,* 43 App. Div.2d 731, 350 N.Y. Supp.2d 690 (1973), to be of little relevance under the circumstances here and under the facts found by the trial court. While it is true that a relationship of confidence may be implied when a disclosure is made solely for the

purpose of advancing or implementing an existing special relationship, no such special relationship existed. The parties were dealing at arm's length and the drawing was submitted only with the purpose of soliciting price information.

The evidence would tend to show that Coatings' overtures had been repelled by RTE over a period of time. No special relationship existed at the time the drawing was disclosed.

The trial court, on the basis of sufficient evidence, concluded that, in any event, there was no breach of confidence, if a confidential relationship existed, because the defendant did not copy the plaintiff's drawing in producing its connector or in developing its own drawings. RTE claimed that its drawing was a trade secret because of the precise dimensions shown therein. Yet, as the trial court found, the Coatings product varied from the RTE drawing in numerous respects. To the extent that RTE was correct in claiming that the specificity of its drawing made it a trade secret, Coatings' eventual product and its drawing with numerous variances therein from the RTE drawing demonstrate that Coatings did not copy RTE's argued trade secret.

While the mere fact that measurements and dimensions differ is not necessarily determinative that Coatings' product was not a copy, in a modified form, of RTE's drawing, the trial court found them not to have any marked resemblance and that all connectors of all manufacturers were generally similar in design. Under these circumstances, where no marked resemblance appeared, the burden of showing independent development did not shift to the defendant. *Pidot v. Zenith Radio Corp.*, 308 Ill. App. 197, 31 N.E.2d 385 (1941).

The facts undisputed of record show that the general design of electrical connectors was in the public domain.

The facts of this case parallel those of *Saul v. International Harvester Co.*, 170 F. Supp. 374 (E.D. Wis. 1959), *affirmed* 276 F.2d 361 (7th Cir. 1960). In that case, the court found that the defendant did not make use of copies of the plaintiff's drawing, but rather prepared its own drawing after a survey of the field. The record herein shows that Coatings' drawing and product came only after its own extensive survey of the electrical manufacturing field and its reliance upon its own technology. Rather than revealing a breach of confidence, the Coatings' drawings and product reveal independent research, independent sources of information, and internally developed technology. RTE's claim of confidentiality is without factual support.

RTE also urges that it is entitled to recover on a theory of misappropriation. It basically argues that the trial court did not apply the tests approved by this court in *Mercury Record Productions, Inc. v. Economic Consultants, Inc.*, 64 Wis.2d 163, 218 N.W.2d 705 (1974), *appeal dismissed* 420 U.S. 914 (1975). The trial court here did not cite *Mercury Record*. Nevertheless, we conclude that it appropriately resolved the misappropriation count against RTE. We stated in *Mercury Record:*

"The elements of the misappropriation cause of action developed in *I.N.S.* are: (1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff." (at 174)

While it is apparent that RTE did indeed spend time and money in creating the design embodied in its drawing and while it indeed has shown that there is now a competitive relationship between it and Coatings in the sale of 200 ampere connectors, it has failed to show that anything was misappropriated. The trial court pointed out that the drawings were so dissimilar, that it was

apparent that Coatings did not, as stated above, copy RTE's drawings. The facts show that Coatings independently developed its own specifications for the electric connector.

The trial court did not explicitly refer to *Mercury Record*, but its opinion sufficiently concluded that nothing was misappropriated. That conclusion was supported by the facts. There has been no proof that anything was misappropriated by the defendant.

RTE's contract claim must fail on the same lack of factual underpinning. As we have stated, whatever contractual relationship was attempted came too late. There was no confidential relationship, contractual or otherwise, and there could be no breach because there was no misappropriation or abuse of confidence.

On motions after trial, RTE, on a claim of newly discovered evidence, asserted that a new trial should be granted in the interest of justice, because in its patent application Coatings directly copied RTE's drawing; and, in addition, RTE claims that Coatings committed a fraud on the United States Patent Office by failing to adequately describe the prior state of the art.

We conclude that these claims, made after the submission of evidence, are irrelevant. The Coatings drawing used in the patent applications was submitted prior to trial; and, as the trial court indicated, it was in any event irrelevant to the case and, as it was pointed out on this appeal, should not qualify as newly discovered evidence because it could have been known with reasonable diligence prior to trial. In any event, the patent applications do not affect the result of this case.

It should be said in passing that the patent-application drawings have similarities to RTE's drawing and also to Coatings' drawing. It can be said, however, with equal truth that both drawings have generic similarity to any

electrical connector of the general type in question. We nevertheless are struck with the inconsistency of the information, apparently submitted by Coatings in its patent application, with its general argument in the instant case. Coatings in its patent application allegedly stated that the applicants were the original first and joint inventors of the particular object sought to be patended. This contrasts with Coatings' general position in the instant case that the inertia welded connector, both in its conception and application, was generally within the knowledge of the electrical industry.

We are not, however, concerned with the inconsistency, if there in fact be one, between Coatings' assertion in the instant case and the declaration of its patent affidavit. The only question presented on this appeal is whether Coatings improperly took RTE's trade secret, misappropriated it, or violated a confidence imposed by contract. The facts, correctly determined by the trial court, and the applicable law show it did not.

Objection is also made to information elicited in a deposition taken of Ramsey, a representative of another firm in the industry. The admission of this testimony was immaterial. We conclude, from a review of the record, that the trial court did not in any way rely on this information in reaching its conclusion, nor have we on this appeal. The error, if it be one, was not prejudicial.

■■■■■■

The evidence adduced in this case demonstrates that whatever the source of Coatings' knowledge, it did not come from RTE and was not taken unlawfully from RTE. The testimony before us would, rather, indicate that Coatings was substantially the originator of the application of inertia welding to electric connectors. Because the facts found by the trial court were not contrary to the great weight and clear preponderance of the evi-

dence, and because those facts demonstrate that RTE proved no cause of action in respect to any of the counts, the judgment of the trial court must be sustained.

*By the Court.*—Judgment and order afffirmed.