This is a case of first impression. There are basically three major issues to be addressed: whether Alabama recognizes the trade secrets doctrine, the scope of the doctrine, and what is the appropriate standard of appellate review when a preliminary injunction has been issued which prohibits the use of a trade secret. We hold that Alabama does recognize the doctrine, and affirm.
The essential facts are as follows:
Robbins, Inc. began manufacturing rotary drilling equipment (the subject matter of the trade secret) in the early 1950's. In 1971, Joy Manufacturing Company (hereafter Joy) purchased the assets of Robbins, Inc. and established the Robbins Division of Joy. These "Robbins Drills" are mounted on wheels or crawlers and are used to drill holes in the earth for the placement of explosives. The construction and mining industries are the primary customers for the drills. There are nine models which range in price from $150,000 to $1,000,000. There are several thousand parts for each drill, some of which are standard and can be purchased from over one hundred suppliers and some of which are specifically designed and manufactured by the Robbins Division for the drills. Joy sells both types of replacement parts to its customers. There are several companies competing with Joy which sell replacement parts for Robbins Drills. The defendant Drill Parts and Service Company, Inc. (hereafter Drill Parts) is one of these competing companies and defendant Carlton Montgomery is its president. Drill Parts' primary business and income is from the sale of these parts. Montgomery worked for Joy as a salesman from 1972 until 1977, when he left Joy to form Drill Parts.
The evidence from which the trial court could have made its findings to support the issuance of an injunction are as follows: Before manufacture of the drills can begin, Joy's engineers design the drills and make an engineering drawing for each part used in the drill. The drawings of the specially manufactured parts are detailed and contain technical data such as allowable tolerances, metal to be used, the heat treatment to be applied, etc. Testimony was offered to show that it takes approximately two years to develop and design a new model drill from the initial design concepts to the finished model. The evidence further indicated that ten to twenty thousand engineering man-hours go into the design and development of a drill model. Testimony was offered to show that much of the information contained in the drawings could not be obtained by "reverse engineering," that is from the study of an actual part. For example, tolerances could not be determined by merely measuring the dimensions of an individual part. The establishment of tolerances for a particular part is a function of the tolerances, heat treatment, metal, etc. of other parts with which the part comes in contact. Testimony was also offered to show that Drill Parts had no engineers in its employ who were capable of reverse engineering. The only testimony about the possibility of reverse engineering was by one Bannister, a subcontractor of Joy, who had manufactured parts for Drill Parts by using the drawings of Joy. The evidence was in dispute as to whether Joy actually had knowledge of Drill Parts' use of the drawings. There is no dispute that Joy did not give express consent to Drill Parts for the use of the drawings.
In addition to technical data, each drawing contains a legend which reads:
 "The design and details shown on this drawing are our property and must not be used except in connection with this machine and Robbins Machine and Manufacturing Company, Inc. All rights of design and invention are reserved."
The evidence was in dispute as to security procedures used by Joy to prevent the drawings from being published to competitors. It was not disputed that Joy has a paper shredder in the offices where the designs are made and that subcontracts have been made by Joy with approximately ten different machine shops to manufacture various parts of drills, using drawings supplied by Joy. Copies of the drawings are *Page 46 
sent to the subcontractors who submit bids to Joy to manufacture the parts. Joy has dealt with each of these shops for several years. After a bid is accepted by Joy, a purchase order is sent to the subcontractor machine shop. On each purchase order, the following is printed:
 "VENDOR: Agrees to supply the materials, equipment, and or services specified below subject to all conditions, specifications and instructions on both the face and the reverse side of this order as well as all attachments hereto.
 "Confidential Disclosure. Seller shall keep confidential all sales, data, designs, processes, drawings, specifications, reports, data, and other technical or proprietary information and the features of all parts, equipment tools, gauges, patterns, and other items furnished or disclosed to the seller by the buyer in connection with this order.
 "Confidential Information. Seller expressly agrees not to use the confidential information or any other information belonging to or supplied by on behalf of the buyer except in the performance of the work for buyer. Seller expressly agrees that a confidential relationship exists between buyer and seller relative to the matter covered by this section. Seller shall return all confidential information and other information or property at the buyer's request and, in any event, upon completion of this purchase order. No confidential information relative to the purchase or use of materials or articles covered by this purchase order is to be published without first obtaining buyer's written consent."
The same subcontractor (Bannister) who had manufactured Robbins drill parts for the defendant, using Joy's drawings without express consent, and who testified about the possibility of reverse engineering, also testified about an incident in 1978 wherein Montgomery, president of Drill Parts, obtained many copies of Joy drawings used by the subcontractor. The subcontractor (Bannister) telephoned Joy and informed agents of Joy, and asked permission to discard many drawings he was no longer using. According to the testimony, Montgomery, whose offices are directly across the street from the subcontractor, later observed the drawings in a trash bin outside the building and asked the subcontractor if he could remove them. The subcontractor testified that he gave his permission without consulting Joy.
In addition to getting the drawings, Montgomery had an arrangement whereby he received scrap from Joy's machine shop. Joy had a contract with a scrap dealer to dispose of metal refuse from the manufacture of machine parts. This included such things as metal shavings, parts improperly machined and other discarded metal products. There was testimony that paper material was often discarded along with the metal scrap. The scrap dealer did not know what was on the papers. Joy did not know of this agreement between the scrap dealer and Montgomery to sell Montgomery this scrap.
In addition to using the drawings in manufacturing, Montgomery also, on October 19, 1982, sold sixty-four copies of engineering drawings of Robbins drills to an undercover police officer for $18,000 cash. Several of the drawings had paper flaps taped over the restrictive language. The Birmingham police officer was assigned to the Leviticus project, a seven-state cooperative of police departments investigating industrial espionage in the coal industry. This officer had contacted Montgomery in the middle of 1982 after an investigation was begun on Drill Parts. Using an assumed name, the officer informed Montgomery that he wished to purchase plans for the manufacture of replacement parts to Robbins drills to be sold in Mexico. On October 18, 1982, the officer and Montgomery met at the Airport Inn and exchanged the money for the drawings. During these conversations, Montgomery admonished the officer not to disclose the source of the drawings to anyone. After the exchange, Montgomery was placed under arrest. No criminal charges had been brought against Montgomery as a result of that incident as of the time of trial of this case. *Page 47 
The plaintiff, Joy, brought suit on November 1, 1982, alleging that its engineering design technology as embodied in its engineering drawings had been improperly obtained and used by Montgomery and Drill Parts and requested the trial court to enjoin the defendants from further use of the drawings. A hearing was held on November 22, 1982, and on December 2, 1982, the trial judge entered an order finding the engineering drawings were "confidential, trade secrets and proprietary items of property owned by Joy" and enjoined the defendants as follows:
 "1. The defendants, Carlton Montgomery and Drill Parts Service, Inc., their agents, servants or employees, are preliminarily enjoined pending further orders of the Court from:
 "A. Using for their own benefit or gain, including the selling thereof, any engineering drawings, blueprints or designs, or copies thereof, developed, engineered, produced or designed by Joy Manufacturing Company or Robbins Machine Manufacturing Co., Inc.
 "B. Manufacturing, machining or selling any drill part made, manufactured or machined utilizing engineering drawings, blueprints or designs developed, engineered, produced or designed by Joy Manufacturing Company or Robbins Machine 
Manufacturing Co., Inc.
 "2. The said Defendants, their agents, servants or employees, are ordered and directed to deposit with the Register of the Court within ten days of the effective date of this order any and all engineering drawings, blueprints or designs or copies thereof, developed, engineered, produced or designed by Joy Manufacturing Co., Inc., in the possession or custody of the said Defendants or their agents, servants or employees.
 "3. This order shall become effective upon the Plaintiff posting security with the Register of the Court in the sum of $25,000 conditioned and as provided by the provisions of Rule 65 (c), Alabama Rules of Civil Procedure."
On motion of the defendants, the order was modified:
 "1. That paragraph 1 B of the order of the Court entered on December 2, 1982, is hereby amended to read as follows:
 "B. Manufacturing, machining or selling any drill part made, manufactured or machined utilizing engineering drawings, blueprints or designs developed, engineered, produced or designed by Joy Manufacturing Company or Robbins Machine 
Manufacturing Co., Inc.; provided that the prohibition here applicable to selling drill parts shall not apply to used drill parts salvaged from drills or equipment, or to those specific drill parts manufactured and sold by Joy Manufacturing Company, or to those drill parts the equal or equivalent of which are not manufactured by or for Joy Manufacturing Company and thereafter sold by Joy Manufacturing Company."
At the hearing, Joy called Montgomery as an adverse witness. On questioning, Montgomery invoked his Fifth Amendment privilege and refused to answer any questions. On January 26, 1983, Drill Parts and Montgomery filed a motion stating that the original investigation had been terminated without presentation of any evidence to a grand jury and requesting that the preliminary injunction hearing be reopened so as to permit Montgomery to testify. This motion was denied by the trial court.
 I
First we discuss the primary issue in this case: Was there a trade secret? We have not directly addressed the trade secrets doctrine in any previous cases, but we have recognized the concept of trade secrets in our rules of procedure, and have recognized a property right in a computer program; for instance, see Ala.R.Civ.P. 26 (c)(7) and National Surety Corp.v. Applied Systems, 418 So.2d 847 (Ala. 1982). In NationalSurety Corp., the two defendants had worked for the plaintiff as a creator of computer programs and as a computer operator. Their employment was for a four-year period. The defendants left the plaintiff's *Page 48 
company and started their own computer service company. Programs were used by the defendants which had been developed for the plaintiff's customers. Evidence showed the programs could only have been obtained by "either an illegal taking, an illegal assumption of ownership, or an illegal use or misuse of the programs." National Surety Corp., supra, 418 So.2d at 849. Also of interest, although not at issue, in National SuretyCorp., is the fact that the plaintiff was granted both a temporary restraining order and a preliminary injunction prohibiting the defendants from using a computer program that was later found to have been converted by the defendants. We hold that National Surety Corp. is ample precedent for our recognition of the trade secrets doctrine in Alabama, and that the doctrine is applicable here.
The Restatement of Torts, § 757 (1939), provides:
 "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
"(a) he discovered the secret by improper means, or
 "(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or
 "(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or
 "(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."
In the comments to § 757, there is a general definition of "trade secrets" adopted by many courts which have addressed the issue:
 "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.
"* * *
 "An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."
One of the earliest trade secret cases reported involved the wrongful appropriation of non-copyrighted patterns used in the manufacture of pumps which were no longer patented. Tabor v.Hoffman, 118 N.Y. 30, 23 N.E. 12 (1889). The plaintiff-inventor had created patterns for each part of his *Page 49 
pump. These patterns were used to form molds which were in turn used to form the individual parts. The inventor sent these patterns to be repaired and the repairman surreptitiously copied the patterns and delivered them to the defendant. The parts were made of different metals which contracted and expanded at different rates. The inventor had "spent much time, labor, and money in making and perfecting such patterns" such that these differences were taken into account in the dimensions used in the individual patterns. Tabor, supra,118 N.Y. 30, 23 N.E. at 13. The Court, discussing these patterns, found:
 "`[T]hat a competent pattern-maker can make a set of patterns from measurements taken from the pump itself, without the aid of plaintiff's patterns,' but refused to find, upon the like request, that this could be done `with little more expense and trouble than from measurements taken from plaintiff's said patterns.' It appeared from the evidence that the finished pump `does not comply with the patterns,' because it is made of brass and iron, which expand unequally in the finished casting, and also contract unequally when cooling during the process of casting; that some of the patterns are subdivided into sections, which greatly facilitates measurements and drawings, as each section can be laid flat upon the wood or paper; and that it would take longer to make a set of patterns from the pump than it would to copy the perfected patterns themselves."
Tabor, supra 118 N.Y. 30, 23 N.E. at 12. There have been many cases since Tabor recognizing that trade secrets can be embodied in patterns and drawings which are capable of being improperly appropriated. RTE Corp. v. Coatings, Inc.,84 Wis.2d 105, 267 N.W.2d 226, (1978), Data General Corp. v. DigitalComputer Controls, Inc., 297 A.2d 437 (Del. 1972), EllicottMachine Corp. v. Wiley Man. Co., 297 F. Supp. 1044 (D.Md. 1969),A.H. Emery Co. v. Marcan Prods. Co., 268 F. Supp. 289 (S.D.N Y 1967), National Rejectors v. Trieman, 409 S.W.2d 1 (Mo. 1966),ILG Industries, Inc. v. Scott, 49 Ill.2d 88, 273 N.E.2d 393
(1971).
What constitutes a trade secret is a question of fact for the trial court. Kodekey Electronics, Inc. v. Mechanex Corp.,486 F.2d 449 (10th Cir. 1973).
The appellants insist that novelty and breach of a confidential relationship are necessary before there can be a trade secret and misappropriation of that trade secret. TheRestatement of Torts § 757 (1939), comment 6, is to the contrary. "Novelty and invention are not requisite for a trade secret as they are for patentability. . . . [Here appears a discussion of patent law.] But such is not the case with a trade secret. Its protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes or devices. The protection is merely against breachof faith and reprehensible means of learning another's secret."
(Emphasis added.) See Kodekey, supra, E.I. Dupont de Nemours v.Christopher, 431 F.2d 1012 (5th Cir. 1970). In Christopher,supra, an unknown competitor had hired professional photographers (the defendants) to take aerial photographs of a methanol plant under construction. The plaintiff alleged it had developed a secret but unpatented process for producing methanol, a process which gave DuPont a competitive advantage over other producers. Because the plant was still under construction, parts of the process were exposed to view from directly above the construction area. Photographs of that area would have enabled a skilled person to deduce the secret process. The court held this was an improper means of discovering DuPont's trade secrets and was actionable.
Drill Parts lastly argues that if the drawings constituted a trade secret, it was abandoned because the plaintiff allowed the engineering drawings to be published through Montgomery's discovery of drawings mixed in with scrap metal and because Montgomery found the drawings in the trash bin of the subcontractor of Joy. Absolute secrecy is not required; a substantial element of secrecy is all that is necessary to provide trade secret protection. See A.H. Emery Co. v. MarcanProducts Co., *Page 50 supra; Kewanee Oil v. Bicron Corp., 416 U.S. 470,94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). Whether Joy had abandoned its trade secrets was disputed, and the law is that whether the holder of a trade secret has abandoned the secret is a question of fact for the trial court. In such cases where the evidence is presented ore tenus and without a jury, findings of fact are presumed to be correct and will not be set aside except for plain and palpable abuse of discretion. Chism v. Hicks,423 So.2d 143 (Ala. 1982), Mac Pon Co. v. Vinsant Painting andDecorating Co., 423 So.2d 216 (Ala. 1982).
 II
Montgomery claims that the trial court in evaluating the evidence erred in considering the fact that he refused to testify. The trial court, in its recitation of facts in the preliminary injunction order, noted that Montgomery had refused to testify. After further recitation of facts, the court then went on to say: "[upon] consideration of these matters and other evidence presented at trial, the trial court finds and concludes to this point in the action that Joy has shown a sufficient case. . . ." Drill Parts argues that the trial court incorrectly presumed that the answers to the questions put to Montgomery by the plaintiff would have been unfavorable to Drill Parts.
We have searched the record and find there was sufficient evidence to support the finding of the trial court, and it was not error for the court in evaluating the evidence to consider
Montgomery's refusal to testify. Anonymous v. Anonymous,353 So.2d 510 (Ala.Civ.App. 1977). See also Kirkland v. Kirkland,236 Ala. 120, 181 So. 96 (1938); C. Gamble, McElroy's AlabamaEvidence § 377.03, (3d ed. 1977). Having determined this, we find no need to require the trial court to reopen the hearing on the preliminary injunction in order to allow Montgomery to testify.
 III
Drill Parts next argues that the federal patent and copyright laws have pre-empted state action in the area of trade secrets, citing Compco Corporation v. Day-Bright Lighting, Inc.,376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), Sears, Roebuckand Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784,11 L.Ed.2d 661 (1964), Kewanee Oil Company v. Bicron Corporation,416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). In Compco, supra, the U.S. Supreme Court held that a state unfair competition law prohibiting the copying and selling of unpatented articles was pre-empted by federal patent law. In Stiffel, supra, the Court similarly held that a state unfair competition law was pre-empted by federal patent and copyright law. In Kewanee,supra, Chief Justice Burger, writing for the Court, held a state's trade secret law was not pre-empted by federal patent and copyright law. Drill Parts argues that "the state of the evidence is inadequate to determine if the federal laws pre-empt state regulation." Apparently, this is in reference to possible patents on the "Robbins Drills." The trial court's order does not prohibit the appellants from using information that is in the public domain as a result of the granting of a patent. The order prohibits the use of engineering drawings by the defendants which were improperly obtained. The defendants are free to use any other proper means for determination of tolerances, measurements, etc. necessary for the manufacture of replacement parts. This would include "reverse engineering," use of patents which have expired, and the use of engineering drawings properly obtained, such as by purchase, or by procuring drawings already in the public domain. This is not a patent case, so our courts are not precluded from acting under their general equity power. See Van Products Co. v. GeneralWeld. Fab. Co., 419 Pa. 248, 213 A.2d 769 (1965), QuakerState Oil Refining Co. v. Talbot, 322 Pa. 155, 185 A. 586
(1936).
 IV
Drill Parts next argues that the trial court abused its discretion by granting the preliminary injunction. This argument is based on an apparent split in our cases as *Page 51 
regards the proper standard of review of preliminary injunctions. Appellants cite two cases which they argue are in conflict on their face. Alabama Educational Association v.Board of Trustees, 374 So.2d 258 (Ala. 1979), InternationalMolders v. Aliceville Veneers Division, 348 So.2d 1385 (Ala. 1977). The apparent discrepancy between the cases, appellants argue, is due to the type of relief granted. Appellants are correct in their argument that the standard of review is different for these two cases; however, the appellants are incorrect as to why the standards are different.
In International Molders, supra, this Court reversed a preliminary injunction which had enjoined a labor union from mass picketing during a strike. The trial court had merely found some evidence of violence or threats of violence toward employees attempting to cross picket lines. We held there was insufficient evidence of "demonstrations of impending violence and threats to personal safety." International Molders, supra, at 1391. In cases involving labor disputes, the power of state courts to issue preliminary injunctions is well settled; however, this power is circumscribed by First Amendment rights and because Congress has pre-empted certain state action by enactment of federal labor laws. See Thornhill v. Alabama,310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), BaggettTransportation Co. v. Local No. 261, 259 Ala. 19, 65 So.2d 506
(1953). We will scrutinize injunctions granted in labor disputes under the strict standard enunciated in InternationalMolders:
 "[T]he right of complainant must be clear and unmistakable on the law and the facts; and there must exist an urgent and paramount necessity for the issuing of the writ in order to prevent extreme or other serious damage which would ensue from withholding it."
International Molders, supra, 348 So.2d at 1390, quoting Cityof Decatur v. Meadors, 235 Ala. 544, 180 So. 550 (1938).
In the review of other cases, the standard in AlabamaEducational Association, supra is to be followed:
 "Initially, we define the perimeter of our scope of review in an appeal from an order granting a motion for preliminary injunction. Wide discretion is accorded the trial judge hearing the application and deciding whether to grant a temporary injunction and his action will not be disturbed on appeal unless he abuses his discretion. . . . His discretion is a legal or judicial one subject to review for abuse or improper exercise, as where there has been a violation of some established rule of law or principle of equity, or a clear misapprehension of the controlling law." (Citations omitted.)
Alabama Educational Association, supra 374 So.2d at 260.
We hold the trial court did not abuse its discretion in granting the preliminary injunction.
 V
Drill Parts next contends that Joy's claim was barred by the statute of limitations; that the applicable statute of limitations is one year in an action based on the trade secrets doctrine and that the evidence shows Joy knew of Drill Parts' use of the drawings for a period of at least five years. This assertion is based on the testimony of the same subcontractor who "gave" the discarded drawings to Montgomery. We have examined the testimony of this subcontractor. The only evidence offered to show that Joy had any knowledge of Montgomery's possession of copies of drawings was a conclusory statement by the subcontractor:
 "Question: And you did not tell Joy or Robbins or anyone over there that you were going to use those drawings, those engineering drawings to make parts for anyone else?
"Answer: They knew it."
No direct evidence was offered to show Joy's knowledge of the improper use of the engineering drawings before the investigation by the police; therefore, we conclude that the trial judge could have found that Joy had no knowledge prior to one year before the suit was filed that Drill *Page 52 
Parts was using its drawings. Having decided that the trial court could have found that Joy had no knowledge of Drill Parts' possession and improper use prior to one year before suit was brought, we need not address whether the trade secrets doctrine would come under the continuing torts doctrine as advocated by Joy. In such cases where the trial court takes the evidence ore tenus without a jury, findings of fact based upon competent evidence are presumed to be correct and will not be disturbed on appeal if supported by the evidence or any reasonable inference therefrom unless they are plainly and palpably erroneous or manifestly unjust. Chism v. Hicks,423 So.2d 143 (1982); Mac Pon Co. v. Vinsant Painting andDecorating Co., 423 So.2d 216 (1982).
For the foregoing reasons, we must affirm.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.