**AFFILIATED PAPER COMPANIES, INC., d/b/a Redstone Paper Company, Plaintiff,**

v.

**Terrell HUGHES, Defendant.**

**No. CV 87–HM–5332–NE.**

United States District Court, N.D. Alabama, Northeastern Division.

Aug. 14, 1987.

Joseph S. Bird, III, Bradley, Arant, Rose & White, Birmingham, Ala., Stuart M. Maples, Bradley, Arant, Rose & White, Huntsville, Ala., for plaintiff.

Douglas C. Martinson, Martinson & Beason, Huntsville, Ala., for defendant.

MEMORANDUM OF DECISION

HALTOM, District Judge.

The above entitled civil action brought by plaintiff AFFILIATED PAPER COMPANIES, INC., d/b/a REDSTONE PAPER CO. ("Redstone Paper Co.") against defendant TERRELL D. HUGHES ("Hughes") on July 31, 1987 seeking preliminary and permanent injunctive relief against defendant, its former employee, enforcing his one-year written covenant not to compete and seeking damages from defendant for breach of such covenant is before the Court upon application of plaintiff for issuance of preliminary injunction enjoining and restraining defendant from competing with plain-

tiff in its trade area comprised of ten (10) designated North Alabama counties and seven (7) designated Tennessee counties and from using and/or utilizing in such trade area certain highly confidential business information concerning plaintiff's business and method of doing business in the form of price and pricing data showing the exact cost to plaintiff of each item offered for sale and plaintiff's recommended sales price, pending final hearing in this cause.

Pursuant to entry of Order herein on July 31, 1987 plaintiff's application for preliminary injunction was set and scheduled for hearing on Friday, August 7, 1987, commencing at 9:30 A.M. Answer of defendant Hughes, together with enumerated affirmative defenses and defendant's Memorandum Brief In Opposition to Preliminary Injunction, was filed herein on August 5, 1987. On the morning of the August 7, 1987 hearing defendant submitted his affidavit and Motion To Dissolve Temporary Restraining Order.[1] On that same date plaintiff filed Memorandum In Support of Preliminary Injunction.

The hearing on plaintiff's application for preliminary injunction commenced on the date and at the hour set in the courtroom of the Federal Courthouse in Huntsville, Alabama. Present: Attorneys Joseph S. Bird, III and Stuart M. Maples and corporate representative James B. Smith (General Manager) for plaintiff; Attorney Douglas C. Martinson for defendant Terrell D. Hughes. The defendant was present in his own proper person. Numerous exhibits, the deposition of defendant Terrell D. Hughes (with exhibits) and the live testimony of James B. Smith was presented. The

case was recessed at 12:30 p.m. until August 10, 1987 at 9:30 a.m. The live testimony of James B. Smith and other exhibits were presented on Monday, April 10, 1987 from 9:30 a.m. to 12:30 p.m. At the close of plaintiff's evidence the defendant rested without presenting further evidentiary matter in opposition. The Court heard the oral argument of counsel.

Upon consideration, the Court is of the opinion for the reasons stated below that plaintiff's application for preliminary injunction is due to be granted pending final hearing of this cause but limited in geographical area, however, to the three (3) Alabama counties and five (5) Tennessee counties in which the defendant Hughes actually and actively solicited business for the plaintiff company during his employment by the plaintiff.

Upon the basis of this evidentiary record the Court hereby finds the following facts specially and states separately its conclusions of law thereon.

### STATEMENT OF THE FACTS [2]

1. Defendant Terrell D. Hughes commenced his at will employment as a sales representative with Redstone Paper Co., a division of Affiliated Paper Companies, Inc. ("Affiliated"), with offices and place of business in the City of Huntsville, Madison County, Alabama, on October 17, 1983.

2. Affiliated is an Alabama corporation operating in a number of Alabama locations and several states through ten or twelve separate unincorporated divisions. Redstone Paper Co. is one of those divi-

---

1. On July 31, 1987 plaintiff applied for issuance of ex parte temporary restraining order (TRO). The Court denied the TRO except in one respect, enjoining and restraining the defendant from divulging to anyone any of the information of plaintiff concerning any account of a customer of plaintiff or any other confidential information concerning the business of the plaintiff

company. This limited TRO expired as of the close of business on August 10, 1987. The Court on August 7, 1987 denied defendant's motion to dissolve the limited TRO without opinion.

2. The facts hereinafter found existed at all times herein pertinent unless the content otherwise indicates.

sions and has engaged in business in North Alabama and parts of Tennessee for over 20 years prior to this lawsuit, selling paper products, janitorial supplies, industrial and military packaging supplies (See Plaintiff's Exhibit #15, Redstone Paper Co. Product List). The plaintiff company represents over 200 separate vendors, has access to over 14,000 items and inventories approximately 2300 items.

3. Redstone Paper Co.'s trade area consists of Madison, Colbert, DeKalb, Jackson, Lauderdale, Limestone, Marshall, Morgan and Lawrence Counties in the State of Alabama and Bedford, Coffee, Franklin, Giles, Humphries, Lincoln and Putnam Counties in the State of Tennessee. However, parts of the trade area in both Alabama and Tennessee had not been fully developed by plaintiff at the times pertinent to this litigation.

4. Redstone Paper Co. makes its sales primarily through sales representatives who call on customers in person and by telephone. It has developed specialized valuable working knowledge concerning doing business with and serving as a vendor of the National Aeronautics Space Administration ("NASA") and Redstone Arsenal in Madison County, Alabama and with contractors and subcontractors which regularly engage in business with such military installations. Moreover, 60% to 70% of Huntsville customers of Redstone Paper Co. are NASA type customers. This specialized knowledge was imparted by the plaintiff company to its sales representatives who worked the Huntsville area, including the defendant Hughes.

5. Terrell D. Hughes has substantial business experience as a salesman in real estate and insurance in Madison County, Alabama and in the business of manufacturing and selling of boat trailers, fishing and pleasure boats and related equipment both in Alabama and Tennessee prior to his employment by Redstone Paper Co. in 1983 at the age of 42. He then resided and has

continued to reside in Winchester, Franklin County, Tennessee. Mr. Hughes, however, was completely inexperienced as a salesman in Redstone Paper Co.'s line of products at the commencement of employment with that company. This evidentiary record shows that the plaintiff company invested substantial sums of money during the period of October 17, 1983 to July 6, 1987 (defendant's period of employment with Redstone Paper Co.) in honing Mr. Hughes' latent selling skills in the highly competitive industry in which Redstone Paper Co. is engaged and imparted to him highly specialized and valuable information concerning that industry and Redstone Paper Co. customers. The proof of the pudding is in the eating. The defendant Hughes became one of Redstone Paper Co.'s best and top sales representatives and effected about 25% of Redstone Paper Co.'s total sales in its last fiscal year prior to his July 6, 1987 resignation. During this same period he had approximately 214 accounts, 65% of which were in the State of Tennessee. At the outset of his employment the plaintiff company gave him about 50 to 60 accounts. Ten months to one year later a Redstone Paper Co. sales representative by name of Susan Sanders left the employ of plaintiff. She had approximately 160 accounts. Most of (the better of) these accounts were given to Hughes.

6. James B. Smith has served as General Manager of Redstone Paper Co. in Huntsville for 23 years. He heads up this division of Affiliated Paper Co. consisting of six sales representatives, inventory control personnel, office personnel, inventory clerk, truck drivers and a 21,000 square foot warehouse for inventory.

7. The Redstone Paper Co. sales representatives bear their own automobile and automobile expense but are not out on the road overnight and consequently have no overnight lodging expenses and generally only one meal a day expense. All salesmen are employed strictly on a commission basis which is calculated on a percentage of

the company's gross profit derived from three different types of sales effected by a sales representative: (1) direct sales—33⅓% of gross profit; (2) indirect sales—31⅓% of gross profit; and (3) warehouse sales—27⅓% of gross profit. Hughes worked under this straight commission arrangement during his employment with Redstone Paper Co.

8. All Redstone Paper Co. sales representatives are permitted to prepare for their own use from the company's meticulously kept and continuously updated records complete price lists and pricing lists which reveal the company's actual cost of each item offered for sale and a recommended sales price for each such item in specified volume. An odd twist in the Redstone Paper Co. sales procedure permits the sales representative himself to establish the selling price of an item to the customer which can be less than the generally recommended sales price and which can also be less than the sales price of the same item sold to another customer in the same volume. The sales representative of Redstone Paper Co. is thus possessed of his employer's innermost business secrets which demand a high degree of confidentiality on the part of the salesman and anyone else connected with the company who is privy to this confidential business information. The Court notes that as a matter of business procedure Redstone Paper Co. keeps to a bare minimum the number of its employees who possess or have access to this confidential information.

9. While Terrell D. Hughes was given no formal training experience by his employer, Redstone Paper Co., prior to the commencement of his sales efforts, the record shows that he was afforded a reasonable period of "inside" time to acquaint himself with plaintiff's catalogs, established sales practices and procedures, inventory records and procedures, warehouse inventory, price and pricing lists, and other business records and information needed by the defendant to equip himself to commence sales. The Court notes that Mr. Hughes was encouraged to personally compile the company's confidential price and pricing lists upon which he would continually rely and utilize on an updated basis in his sales efforts with customers.

10. Mr. Hughes initial "draw" from Redstone Paper Co. was $200.00 per week. This draw was later increased to $300.00 per week. While his "draw" was against commissions to be earned against his sales, Mr. Hughes worked for Redstone Paper Co. throughout its 1983–84 fiscal period without producing sales which generated commissions equaling the amount of his draw (Plaintiff's Ex. # 1). The fiscal year of the plaintiff company commences on June 1st or July 1st. As a matter of fact it was not until the fifth fiscal period of the 1984–85 fiscal year that the commissions he earned equaled his draw. Nonetheless, Hughes was not required by Redstone Paper Co. to reimburse the company this difference. The commissions and compensations paid Hughes by Redstone Paper Co. on a fiscal year basis are reflected in the following columns:

1440

[Plaintiff's Ex. #1]

| | Commissions | Compensation Paid |
|---|---|---|
| 83–84 | $ 2,780.00 | $ 7,500.00 |
| 84–85 | 19,935.00 | 20,507.00 |
| 85–86 | 34,633.00 | 33,754.00 |
| 86–87 | 41,472.00 | 41,466.00 |

In addition to his commissions Hughes was afforded certain fringe benefits by Redstone Paper Co. which did not include a profit sharing or retirement plan. One of the reasons advanced by defendant for his July 6, 1987 resignation (dated and stated to be effective on July 2, 1987) was the failure of Redstone Paper Co. to provide a retirement plan for its employees (Plaintiff's Ex. # 8).

11. Hughes worked for Redstone Paper Co. under oral agreement from October 17, 1983 to April 8, 1985. A short time prior to this latter date James B. Smith, the General Manager of Redstone Paper Co., determined that all of his sales representatives (six in number) should be bound to their employer by written covenants not to compete. At that particular time two of these salesmen had executed such a document. Two other sales representatives were relatively new in their employment and had not been asked or required to enter into such employment contract. Smith thereupon issued a directive to all other sales representatives, including Hughes, that each sales representative forthwith execute the standard Sales Agreement Contract form under the terms of which the employee, inter alia, agreed and promised that upon termination of his employment with his employer (Redstone) he would not compete with his employer in his employer's trade area or work for a competitor for a period of one year from date of termination. A form agreement was furnished to each sales representative not under such contract. The evidence shows without dispute that the General Manager of Redstone Paper Co. made it abundantly clear to all such sales representatives, including Hughes, that execution of the agreement was a prerequisite to continued employment. Although Hughes drug his feet in response, he executed such agreement with Redstone Paper Co. on April 8, 1987 after the General Manager sent word to him through his uncle (also a sales representative for Redstone Paper Co.) that it was "sign or else." A copy of the April 8, 1985 Employment Agreement is reproduced in the Appendix hereto. All six sales representatives signed the Redstone Paper Co. Sales Agreement contract, including Mr. Hughes' uncle.

12. As the defendant Hughes continued to prosper with Redstone Paper Co. his ambition soured his success. Whether real or fancied, his mind augered over grievances against his employer. The absence of a company retirement plan rankled him. His recollection was that at the beginning of his employment in October 1983 it was pointed out to him that a retirement plan was being formulated and would be in place within a year; he mentioned the retirement plan issue to Mr. Smith several times and was told that work on the plan was in progress; however, in May 1987 after Smith's return from a meeting at the home office Smith told him the retirement plan was a dead issue. Hughes was also unhappy over Redstone Paper Co.'s reaction to his (Hughes) desire to develop new territory in Tennessee, particularly the Lewisburg and Pulaski areas. He reasoned that the company's decision that there were not enough sales to make the deliveries (to these Tennessee areas) was ill founded. He determined that one way his income could be increased was for him to receive more help from inside staff personnel which would free his time for more outside selling. He was unhappy with his perception of the company's reaction.

Hughes candidly admits his dissatisfaction with Redstone Paper Co. since January 1, 1987.

13. In April or May 1987 Hughes was in Nashville, Tennessee on a family matter (wife in hospital) and called Mead Merchants Paper Packaging Supplies ("The Mead Corporation"; and "Mead"), a competitor of Redstone Paper Co., which has offices in both Nashville, Tennessee and Birmingham, Alabama. Hughes knew of Mead and had competed against them. Mead had long engaged in business in Tennessee and in the Huntsville, Alabama area. He talked with Dennis McNeal, Nashville sales manager of that company, told McNeal who he was with and of his possible interest in changing employment. The result was a face-to-face conference in Nashville a week or so later between Hughes and McNeal. McNeal and Hughes met a short while later in Huntsville, Alabama at the Hilton Hotel. The two men discussed the present Redstone Paper Co. customers of Hughes. Hughes inquired if Mead would permit him to keep them. McNeal advised not on some accounts because they were being serviced by other Mead sales representatives. McNeal later gave Hughes a list of the Redstone Paper Co. customers he (Hughes) could keep if he went to work for Mead. Hughes told McNeal the territory he wanted, namely, Madison County in Alabama and Lincoln, Franklin, Coffee, Warren and Bedford Counties in Tennessee. McNeal replied that Hughes' request would have to be evaluated. The two men discussed in detail the Redstone Paper Co. customers which Hughes then had although Hughes denies that he gave his customer list to McNeal. Hughes brazenly admitted on deposition that he intended to keep all of Redstone Paper Co. customers he could in connection with his new employment by Mead.

Jim Gardenhire, Mead's general manager with offices in Birmingham, also attended the second meeting in Huntsville at the Hilton wherein Hughes' contemplated employment switch to Mead was discussed at length.

A third Mead-Hughes meeting in Huntsville at the Howard Johnson Motel thereafter took place between June 10–19, 1987 attended by Gardenhire, McNeal and Hughes. Hughes told the Mead officials that his annual earnings with Redstone Paper Co. were in the $40,000.00 range. In this meeting the specifics of Hughes' commission from Mead and a territorial breakdown was discussed and agreed. Hughes admits that he and the Mead officials talked about mutual customers on numerous occasions. Hughes was given Madison County (Huntsville) in Alabama with exception of accounts then serviced by another Mead sales representative and Lincoln, Franklin, Coffee and Warren Counties in Tennessee with possibility that Mead would later transfer to Hughes other Alabama and Tennessee accounts. Plaintiff's Exhibit #4 is a handwritten memorandum of that meeting prepared by Gradenhire and sent to Hughes a short time thereafter. Mead agreed to pay Hughes a flat expense allowance of $250.00 per month plus sales commissions on a basis not revealed by the evidentiary record for sales he would make of Mead's general packaging and industrial supplies. It is undisputed that the product lines offered by Redstone Paper Co. and Mead overlap to a considerable extent. At this third meeting Hughes was given a copy of the Mead employment agreement which he would be required to sign if he went to work for Mead (Plaintiff's Exhibit #7); Hughes subsequent execution of this agreement is later recounted.

14. By letter dated June 25, 1987 Mead confirmed its offer of employment to Hughes (Plaintiff's Exhibit #3). After taking a physical in Nashville required by Mead and visiting the Mead warehouse in Nashville, Hughes made his employment switch decision and on July 1, 1987 executed a written employment agreement with the Mead Corporation (Plaintiff's Exhibit #7). A copy of the Mead-Hughes employment agreement is reproduced in the Appendix hereto. Significantly, ¶¶ 1, 2 and 3 of this agreement read:

1. I have no contract, agreement, claim or obligation which may be in conflict

with any obligation I have undertaken under this Agreement.

2. Except as my assigned duties may require or as MEAD may otherwise consent in writing, I will not disclose at any time either during or subsequent to my employment, any information, knowledge or data of MEAD which I may develop or receive during the course of my employment relating to financial data, writings, computer software, sales policies, customer information, conceptions, inventions, trade secrets, sources of supply, know-how, plans and programs, or other knowledge of MEAD's which is of a proprietary or confidential nature (the "Information"); and I will deliver to MEAD upon termination of my employment all documents, equipment and other records of such information, knowledge or data.

3. In the course of my employment I will learn of and hopefully will conceive MEAD Information during MEAD time and at MEAD expense, which Information relates to MEAD interests and is likely to be of benefit both to MEAD's competitors and to MEAD even after termination of my full time employment. I recognize a just purpose in MEAD's protecting its investment in that Information and related training and experience afforded me at MEAD's expense. I also recognize a just purpose in MEAD's effecting such protection through continued use of my knowledge and judgment and though avoiding, for limited times, competition by, through and from former employees trained and/or given special knowledge, contracts and/or experience by MEAD in MEAD's line of business and with MEAD's equipment, designs, methods, processes, contacts, data, know-how and money. Accordingly, and with full knowledge that Mead will rely on this agreement in employing me or in continuing to employ me, I agree that:

(a) during my employment and for one year after the termination of my employment, I will not either directly or indirectly divert or aid others in diverting any trade which MEAD was enjoying at the time of such termination or which I had solicited on MEAD's behalf during the last six months of my employment at MEAD;

b) during my employment and for one year after the termination of my employment I will not own, manage, control or operate, or act as an employee, sales representative, sales executive, consultant or independent contractor of, any business which sells, delivers or deals in any of the products of the Mead Merchant Division, or substantially similar products, within seventy-five miles of any Mead Merchant location within the Mead Merchant Southern Area to which I have been assigned at any time during my employment.

c) during my employment and for two years after the termination of my employment, I will not either directly or indirectly entice, aid or cooperate with others in soliciting or enticing any MEAD employee to leave MEAD's employ for other employment;

d) without limiting the term of my general obligation to honor MEAD's confidential and trade secret information for so long as it remains protectable, I specifically agree that during my employment and for one year thereafter, I will accept no employment wherein the performance of the duties and responsibilities of the new employment will call upon me to use, to disclose or to base judgments upon the confidential or trade secret information of MEAD, or to utilize the good will of MEAD in making sales for a competitor of MEAD.

15. Prior to signing The Mead Corporation employment agreement Hughes told the Mead officials of his employment and non-compete agreement with Redstone Paper Co. This occurred after the three meetings between Mead officials and Hughes and after he had taken the Mead employment agreement home with him and after reading it. Hughes testified that he may have told Mead about his employment agreement with Redstone Paper Co. by telephone after their third meeting. Thus, the evidence shows without dispute that

the Mead Corporation knew of Hughes' covenant not to compete with Redstone Paper Co. before Mead and Hughes executed the Mead Employment Agreement on July 1, 1987. Hughes testified that Mead made no comment about his (Hughes) covenant not to compete with the plaintiff company. The evidence does show, however, that prior to signing the Mead employment agreement that Hughes discussed his Redstone Paper Co. employment agreement with Attorney Douglas Martinson of Huntsville (counsel of record for Hughes in this litigation) and showed the agreement to Mr. Martinson. There is no evidence regarding Mr. Martinson's advice to Hughes. Hughes did not show the Mead employment agreement to Martinson nor did he discuss his Redstone Paper Co. employment agreement or his impending breach of such agreement with any Redstone Paper Co. official. Hughes also testified that he consulted an attorney in Winchester, Tennessee about his Redstone Paper Co. covenant not to compete. Again, the record is silent regarding this Tennessee lawyer's advice. The testimony of Hughes shows, at least by reasonable inference, that he was fully aware at all times of the legal risk he was taking in accepting employment from a competitor of Redstone Paper Co. despite the written one-year covenant not to compete in his Redstone employment agreement.

16. At the times Hughes met with the officials of Mead in Nashville and subsequently in Huntsville on two separate occasions and at the time he and Mead officials executed the July 1, 1987 Mead-Hughes Employment Agreement the defendant Hughes still retained in his possession and under his control the Redstone Paper Co. price and pricing lists pertaining to all products offered for sale by Redstone Paper Co. which disclosed Redstone Paper Co.'s exact cost for each product offered for sale and the suggested sale price of each item. The Court finds as an established fact that during these referenced meetings and prior to his employment by Mead the defendant Hughes disclosed to Mead the names and locations of the Red-

stone Paper Co. customers which he serviced and sold.

17. Hughes gave Redstone Paper Co. no advance notice of his resignation. On July 6, 1987 he walked into J.B. Smith's office in Huntsville and submitted his written resignation dated July 2, 1987 effective that date (Plaintiff's Exhibit # 8). Mr. Smith testified that the meeting lasted 10 to 12 minutes, that Hughes answered "I don't think so" to his direct question: "Are you going with a competitor." Smith related his retort to Hughes: "Obviously, you are going with a competitor, otherwise you would be willing to stay and help us." Smith then inquired of Hughes if he recalled his noncompete covenant. Hughes replied: "Yes, I have discussed it with my lawyer." Smith asked Hughes to reconsider. On July 9, 1987 Smith learned that Hughes had gone to work for Mead. Hughes stated that his letter of resignation reflected his reasons for leaving the plaintiff company. This evidentiary record clearly shows that Hughes started calling on customers for Mead on Tuesday morning, July 7, 1987 and that from that date to the date of his deposition in this lawsuit taken on August 6, 1987 he had called on as many former Redstone Paper Co. customers as he could soliciting sales for Mead. The bulk of his sales for Mead have been in Madison County, Alabama and in Lincoln, Franklin, Coffee and Warren Counties in the State of Tennessee. While Hughes admits he has made sales to former Redstone Paper Co. customers during his first month of employment by Mead, he was evasive in his deposition as to the identity and location of such customers. He did, however, furnish the names of approximately forty (40) former customers of the plaintiff company which he had called on for Mead (Hughes' deposition, pp. 192–195). James B. Smith, General Manager of Redstone Paper Co., testified concerning thirty-four (34) specific customers of his company called on by Hughes for Mead. Nine (9) were in Madison County, Alabama twenty (20) in Franklin County, Tennessee, three (3) in Coffee County, Tennessee, two (2) in Lincoln County, Tennessee and one (1) in Morgan County, Alabama. Plaintiff's

Exhibit #12 is Mead's product or resource list which Hughes has given to potential Mead customers. With determination and candor Hughes proposes to secure for Mead all of his former Redstone Paper Co. customers.

18. Hughes made no effort of any kind to secure employment in an area non-competitive with Redstone Paper Co. The Mead Corporation was his only contact. Hughes: "Mead is one of the largest, if not the largest, in the business and if I was going to change I might as well try to go for the best" (Hughes' deposition, p. 212).

19. Hughes has maintained a sideline part-time rubber coating of marine parts business at his home in Winchester, Tennessee since 1977 and annually sells from 5,000 to 7,000 units to T & H Marine of Madison, Alabama for which he receives $1.25 per unit. He admits to a 50% profit per dollar of sales volume. The Court draws a reasonable inference from the record that if Hughes were engaged in this business on a full time basis it would be quite profitable.

20. The defendant Hughes testified that he turned over to the plaintiff company on July 6, 1987 all Redstone Paper Co. catalogs, price and pricing lists and other confidential documents. There is no evidence to the contrary but the record is silent whether he first made copies for himself of this confidential material.

21. While the plaintiff company's trade area is defined as ten (10) designated North Alabama counties and seven (7) designated Tennessee counties (¶ 4 of complaint), the Court finds from the evidence that during his employment by Redstone Paper Co. during the period of October 17, 1983 to July 6, 1987, the defendant Hughes' actual and actively worked geographical sales territory was comprised of the counties of Madison (in which the City of Huntsville is located), Morgan and Limestone in the State of Alabama and the counties of Bed-

ford, Coffee, Franklin (in which the City of Winchester, defendant's place of residence, is located), Giles and Lincoln in the State of Tennessee.[3]

22. More than ninety (90) Mead products are competitive to products offered for sale by Redstone Paper Co. The evidence is clear that Mead is an active competitor of the plaintiff company and competes with Redstone Paper Co. in the Alabama and Tennessee counties which Hughes actually and actively worked for plaintiff.

23. Plaintiff's Exhibit #9 is a list of Hughes' active Redstone Paper Co. customers as of the date of his resignation on July 6, 1987. Plaintiff's Exhibit #5 is a similar customer list compiled from Hughes' deposition in this case showing Hughes' sales (dollar volume) during his last year of employment by the plaintiff company. These exhibits buttress the findings of fact above set out.

24. While this evidentiary record does not enable the Court to make specific findings at this juncture of the case respecting the actual monetary damage sustained by Redstone Paper Co. as a proximate result of Hughes' numerous violations (as an employee of Mead) of his non-compete covenant with the plaintiff company between the dates of July 7, 1987 to the date of the conclusion of the hearing on plaintiff's application for preliminary injunction, the Court is thoroughly persuaded and finds that such monetary damage is substantial in dollar amount and will continue to grow significantly unless defendant Hughes is enjoined and restrained from continuing to commit such violations. The nature of Mr. Hughes' present employment with Mead is such that it can reasonably be anticipated that on each business day hereafter he will continue to seek to sell Mead products to former Redstone Paper Co. customers. Each such attempted sale and each such actual sale will be a separate and distinct violation of his covenant not to compete contained in his Redstone Paper Co. Sales

---

3. Upon the development of this clearly established fact, plaintiff orally modified of record its application for preliminary injunction in this cause so as to define the trade area applicable to defendant's covenant not to compete with the plaintiff company to constitute the three (3) North Alabama counties and the five (5) Tennessee counties which Hughes actually and actively worked for Redstone Paper Co.

Agreement Contract. Soon (if not already) these former Redstone Paper Co. customers will be Mead's regular customers. The mushrooming effect of these multitudinous violations of Hughes' covenant not to compete with the plaintiff company will inevitably result in irreparable damage to plaintiff, if not enjoined by this Court. Since Hughes departed the employ of plaintiff, the total dollar volume of Redstone Paper Co. sales has shrunk approximately 25%, according to J.B. Smith, General Manager of plaintiff, who attributes the shrinkage to Hughes' competition in the employ of Mead.

25. The Court finds the testimony of James B. Smith, General Manager of Redstone Paper Co., to be creditable and believable. The Court believes Mr. Smith's testimony in this case and gives substantial weight to it in making the within findings of fact. Actually, there are few conflicts between Mr. Smith's live testimony and the deposition testimony of defendant Terrell D. Hughes. Where conflicts do exist, the Court has accorded more credibility and believability to the testimony of Mr. Smith based upon his demeanor on the stand while testifying and his straight forward, concise, believable answers to the questions posed to him by counsel.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332 (diversity of citizenship and amount in controversy). Personal jurisdiction and venue are not contested.

2. The Sales Contract Agreement between Redstone Paper Co. and Terrell D. Hughes dated April 8, 1985 (reproduced in appendix) containing the employee covenant not to compete was executed in the State of Alabama by an Alabama corporation and its employee whose duties of employment required that he perform a substantial portion of his duties in the State of

Alabama and is to be construed under Alabama law.

■ 3. Section 8–1–1, Code of Ala. (1975),[4] expresses the public policy of Alabama that contracts restraining employment are disfavored. *James S. Kemper & Co. v. Cox & Associates*, 434 So.2d 1380, 1384 (Ala.1983). Nevertheless, the courts will enforce the terms of a covenant not to compete if:

1. The employer has a protectible interest;

2. The restriction is reasonably related to that interest;

3. The restriction is reasonable in time and place;

4. The restriction imposes no undue hardship on the employee.

*Id.* at 1384. In order to have a protectible interest the employer must possess a substantial right in its business sufficiently unique to warrant the type of protection contemplated by a noncompetition agreement. *Id.* at 1384. In the case of a "post-employment restraint," as in the present case, justification, according to the Supreme Court of Alabama's approval of the Restatement (Second) of Contracts § 188, Comment B (1979), generally must be "on the ground that the employer has a legitimate interest in restraining the employee from appropriating valuable trade information and customer relationships to which he has had access in the course of his employment." *Id.* at 1384. The Supreme Court of Alabama in the *James A. Kemper & Co.* case quoted with approval its holding in *DeVoe v. Cheatham*, 413 So.2d 1141, 1143 (Ala.1982): "if an employee is in a position to gain confidential information, access to secret lists, or to develop a close relationship with clients, the employer may have a protectible interest." *Id.* at 1384.

In the case of *Drill Parts and Service Company, Inc. v. Joy Manufacturing*

4. The Redstone/Hughes agreement falls within one of the exceptions of paragraph (b) of Section 8–1–1, Code of Alabama 1975, the pertinent portion of which provides as follows:

"(b) ... one who is employed as an agent, servant or employee may agree with his em-

ployer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city or part thereof so long as the ... employer carries on a like business therein."

*Company,* 439 So.2d 43 (Ala.1983), the Supreme Court of Alabama recognized the trade secrets doctrine, held that *National Surety Corp. v. Applied Systems,* 418 So.2d 847 (Ala.1982), was ample precedent for its recognition, decided that the doctrine was applicable to the facts of that case (engineering drawings of parts), and affirmed the action of the trial court granting a preliminary injunction against the defendant parts company and its president enjoining and restraining them from using the drawings. In recognizing such doctrine and making such holding Alabama's highest appellate court quoted with approval the trade secrets doctrine stated in the Restatement of Torts, § 757 (1939), which provides:

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

"(a) he discovered the secret by improper means, or

"(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

"(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

"(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."

439 So.2d at 48. The Alabama Supreme Court in this last cited case quoted the comments to § 757:

In the comments to § 757, there is a general definition of "trade secrets" adopted by many courts which have addressed the issue:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management."

439 So.2d at 48.

In the present case, defendant Terrell D. Hughes clearly had access to valuable, confidential trade information and customer relationships in the course of his employment with Redstone Paper Co. Through the plaintiff company, Hughes was intimately privy to his employer's regular customers and to the actual cost of each of the multitudinous items offered for sale to customers in that portion of plaintiff's trade area in Alabama and Tennessee which the defendant Hughes actively and actually worked and to the recommended sales price of each such item. Moreover, the defendant acquired knowledge during his period of employment with Redstone Paper Co. which covered a span of several years of the "rock bottom" prices of products at which the plaintiff company was willing to sell. In addition, plaintiff imparted to the defendant its know-how and savvy of how to deal with NASA and Redstone Arsenal and the numerous NASA type customers in the Madison County, Alabama area, confidential, highly valuable business knowl-

edge developed by Redstone Paper Co. over a period in excess of twenty years. Such information and the clientele acquaintance involved clearly constitute trade secrets and under Alabama law a protectible interest of the plaintiff company.

■ Each contract restraining employment must be tested on the facts of the particular case as to whether the restriction upon one person is greater than necessary for the reasonable protection of a substantial interest of the other party. *Robinson v. Computer Service Center, Inc.*, 346 So.2d 940 (Ala.1977).

■ The Court finds and holds as a matter of fact and law that·no part of the defendant Hughes' covenant not to compete contained in the April 8, 1985 Sales Agreement Contract between the plaintiff and defendant was unreasonable or unfair. The restrictions in the covenant reasonably relate to the protection of Redstone Paper Co.'s interest in its trade area in Alabama and Tennessee and to its customers in such areas in which the plaintiff company has a most substantial investment in labor, time and money and in which the defendant Hughes was intimately involved through the business grace of his employer. Furthermore, there can be no doubt that a one year period for the restriction is reasonable under Alabama law. See *James A. Kemper & Co.*, 434 So.2d at 1384, where the injunction of the trial court was extended to the entire State of Alabama.

The Court is persuaded, finds and holds that enforcement of the defendant Hughes' covenant not to compete with Redstone Paper Co. will impose no *undue* hardship on Mr. Hughes (emphasis supplied). The preliminary injunction will be keyed to the three (3) county area in North Alabama and the five (5) county area in Tennessee which he actually and actively covered for the plaintiff company during his period of employment. If a permanent injunction is issued the duration will be one year from and following July 6, 1987, the date on which he actually resigned from his employment with Redstone Paper Co. The

defendant Hughes will be free to continue in his present employment with the Mead Corporation, assuming its willingness, in geographical areas in both Alabama and Tennessee outside the counties of Madison, Morgan and Limestone in Alabama and the counties of Bedford, Coffee, Franklin, Giles and Lincoln in Tennessee. Moreover, in event permanent injunction is issued and Mead is unwilling to employ Hughes during the one year enforcement period of the noncompetition clause, his prior business training and experience will equip him for other remunerative employment. Furthermore, he has operated a part time business of his own since 1977 and presumably will continue this renumeration pursuit. Finally, the blame for his predicament rests on his own shoulders.

■ 4. Defendant Hughes asserts defensively that there was no consideration for his execution of the April 8, 1985 Sales Agreement Contract, presumably because he had at the time of his execution of that document been in the employ of the plaintiff company since October 17, 1983 under an oral at will employment agreement terminable at will of either party.[5] His counsel has cited no Alabama authority supporting this position. Furthermore, *Daughtry v. Capital Gas Co., Inc.*, 285 Ala. 89, 229 So.2d 480 (1969), is clear authority that a covenant not-to-compete need not be signed at the time the employee begins working for the employer. Instead, an employer may obtain a covenant not-to-compete *after* the employee begins work, and the covenant may be based merely on continuation of employment after the covenant is signed by the employee. In *Daughtry*, the plaintiff sought to enforce a covenant not-to-compete against a former employee who had sold liquified petroleum gas and appliances. A primary question was whether a covenant could be enforced even though it had not been signed at the time the plaintiff began working for his employer. Daughtry was employed originally on January 15, 1986, with an oral agreement to be branch manager of an office of the plain-

---

**5.** Both parties construe defendant's original employment by the plaintiff company as an oral agreement terminable at will of either party. The Court accepts this construction.

tiff. Six months later on June 1, 1966, Daughtry executed a written contract of employment not-to-compete in a four county area for a period of two years after the termination of his employment with his employer. In February of 1967, Daughtry voluntarily tendered his resignation to the company and it was accepted. The Supreme Court of Alabama held that "the valid consideration for signing the contract was the *continued* employment of Daughtry by Capital Gas under the contract (from June 1, 1966, to February 1, 1967) during which time he performed services for the company for which he was compensated." 285 Ala. at 92–93, 229 So.2d 480.

5. Counsel of record for defendant cites three Alabama cases as supportive of defendant's position that the facts of the present case do not warrant either preliminary or permanent injunctive relief. Out of deference to able counsel the Court has carefully read and analyzed the three cases cited in defendant's Memorandum Brief In Opposition To Preliminary Injunction and finds that defendant's reliance thereon is misplaced for the simple reason that the fact situation of each of these cited authorities is dissimilar to the facts of the present case. A discussion of the three cases follows.

*Birmingham Television Corp. v. DeRamus*, 502 So.2d 761 (Ala.Civ.App.1986), involved an action brought by a television station in Birmingham, Alabama against its former advertising salesman and a competing television station who hired the salesman away, seeking to enforce the former salesman's noncompetition agreement and asserting a claim against the defendant television station for tortious interference with business. After originally awarding one dollar in damages for breach of contract and $5,000.00 punitive damages and enjoining the defendant salesman, the competing television station and its employees from doing business with plaintiff's customers for the six-month term of the noncompetition agreement, the trial court vacated the injunction but let the damage awards stand. Cross-appeals were filed.

The facts in the *DeRamus* case pertinent to the noncompetition issue were these:

Tommy DeRamus had been employed as a salesman with two Birmingham radio stations for the two years preceding his employment as an advertising salesman with the plaintiff, Birmingham Television Corporation, d/b/a WBMG–TV (Channel 42). As a condition of his new employment, DeRamus signed an agreement stating that he would not work for any other radio or television station in the Channel 42 broadcast area for a period of six months after leaving Channel 42's employment. There was no other written contract of employment. At trial, Channel 42 testified that the defendant's employment was terminable at will by either Channel 42 or DeRamus.

DeRamus worked for Channel 42 for two months before taking a job as a salesman with defendant, Taft Television and Radio Company, Inc. (Channel 6). Channel 6 is a station with a much larger broadcast area than the plaintiff's, but is nevertheless a competitor. The evidence was uncontroverted that a factor in DeRamus's decision to leave Channel 42 and join Channel 6 was the role played by Jack Gunnels, the local sales manager at Channel 6. Gunnels had recently been promoted to his manager position and had need of a new salesman to take his old job. He sought out DeRamus and offered him a job. DeRamus accepted the offer, though advising Channel 6 of the agreement with Channel 42 not to compete. There was no evidence that Channel 6 employed DeRamus with the intention of injuring plaintiff's business or that plaintiff's business was in fact financially injured. DeRamus had only worked for Channel 42 for two months. The court found that the evidence of damage to Channel 42 was so speculative that an amount of damage could not be determined.... *there was no evidence that Channel 6 used information, if any, gleaned by DeRamus from his employment by Channel 42 to gain any unfair competitive advantage with a*

*resulting injury to Channel 42.* (emphasis added).

502 So.2d at 763.

The Court of Civil Appeals of Alabama held in *DeRamus* that the contract, when applied to DeRamus was an unreasonable restraint of trade in violation of § 8–1–1 (Ala.Code 1975) and was therefore invalid and unenforceable. The kernel of the court's reasoning is found at 502 So.2d at p. 764:

> Our review of the evidence finds it insufficient to support the finding of a substantial protectible interest of Channel 42 in restraining the employment of DeRamus by Channel 6. We consider that the evidence as to alleged trade secrets, confidential information and customer lists given to or learned by DeRamus during his brief two-month employment were not so substantial or unique as to rise to the status of protectible interest, but in fact, were matters or information common to others in the business and were known to or easily obtainable by such others.

Obviously the facts of *DeRamus* are distinguishable from the facts in the present case. Moreover, the citation by the Alabama Civil Court of Appeals of *Rice v. United Insurance Co. of America,* 465 So.2d 1100 (Ala.1984), for its stated conclusion: "The restriction is even more unreasonable in light of the fact that DeRamus could be discharged at any time without cause and without recourse" (502 So.2d at 764) is inapposite since the *Rice* case only involved an action by a former employee against her former employer and her supervisor asserting causes of action for emotional distress, breach of employment contract and wrongful termination of employment. The only holding of *Rice* on the employment at-will issue is found in the next to last paragraph of the opinion (465 So.2d 1103):

> Rice has not stated a claim for breach of contract for employment. She alleges defendants "improperly, impermissably and illegally discharged her." The trial court correctly determined that her em-

ployment contract, indefinite in time, was terminable at the will of either party. While the Civil Court of Appeals of Alabama is undoubtedly vested with power and authority to make the determination that an at-will contract of employment is a factor to be considered under Alabama law in determining whether a noncompetition clause in a given fact situation is unreasonable in the absence of precedential case authority by the Alabama Supreme Court to the contrary, this Court's research has failed to find either an Alabama Court of Civil Appeals or a Supreme Court of Alabama decision which is authority for or supportive of the *DeRamus* holding above referenced on the at-will employment issue in noncompetition clause cases. In any event this Court is thoroughly persuaded that Terrell D. Hughes' employment contract with Redstone Paper Co., terminable at the will of either party, does not under the facts of this case dictate or require a determination under Alabama law that the noncompetition clause in question was unreasonable.

In *Calhoun v. Brendle, Inc.,* 502 So.2d 689 (Ala.1986), a former employer brought an action against its former employee seeking to enforce a covenant not to compete. The trial court granted an injunction preventing the former employee from competing with the plaintiff company for a period of five years. The former employee appealed. The Alabama Supreme Court held that the covenant not to compete was unenforceable and reversed and remanded. The facts of the case which were not in dispute appear on p. 690 of 502 So.2d:

> Brendle, Inc. is engaged in the business of selling and servicing fire extinguishers, halon fire extinguishment systems, automatic sprinkler systems, and hood systems, as well as selling dry ice, carbon dioxide gas, and safety supplies. Brendle is the largest fire equipment company operating in the City of Montgomery; it services over 90% of all Montgomery area fire extinguishers and fire protection systems. It also provides fire protection service to businesses throughout central and southern Alabama, as well as northern Florida.

In 1975, Brendle hired Calhoun at minimum wage as part of its shop crew. Calhoun's duties included filling and servicing fire extinguishers, assisting in the installation of fire extinguishment equipment, and delivering dry ice. Incidental to his service work, as all of the shop crew members were instructed to do, Calhoun would sometimes suggest to a customer that he needed additional equipment. Calhoun testified that he would always refer the customer to Brendle's office for more information as to pricing and products. He was not permitted to offer, nor did he prepare, bids on equipment for potential Brendle customers. His duties at the time he left Brendle's employ in 1984 were not significantly different from those he had when he started; he was still a member of the shop crew, he still inspected and filled fire extinguishers, and he still assisted in the installation of fire extinguisher systems. He also still delivered dry ice.

In December of 1982, Calhoun signed an employment contract which contained the following provisions:

"In the event such employment agreement is terminated, Employee hereby promises, covenants and agrees with Employer that for a period of five (5) years from the date of the termination of this agreement, he will not compete, directly or indirectly, either in the fire equipment business or as an employee in same within a one hundred (100) mile radius from the city of Montgomery, Alabama, and Employee agrees not to solicit any fire equipment business and carbon dioxide gas or dry ice business from any and all of the customers of Employer or from any other person, firm or corporation, except on behalf of Employer during this five year period."

Calhoun left Brendle's employ in August of 1984, borrowed $5,000 from a bank, and, with William Michael Ray, organized a corporation, Fire Tech, Inc., for the purpose of engaging in the business of selling and servicing portable fire extinguishers and small fire extinguishment systems in and around the Mont-gomery area. Because there was not enough business to support both Ray and Calhoun, Ray left the employ of Fire Tech, Inc., in December of 1984. Calhoun operates Fire Tech, Inc., out of his mobile home residence. The only employees of Fire Tech, Inc., are Calhoun and his wife. During its first full year of business, Fire Tech's gross revenues were $36,724.86, and the business showed an operating loss for the year of $7,803.71 (taking into account $8,000 in salaries paid to Calhoun and to his wife and $500 paid to Ray).

During the first few months of conducting his business, Calhoun solicited approximately fifteen of Brendle's customers, four of which ultimately became customers of Calhoun. Testimony of two of these customers who switched to Calhoun indicated that they did so because they were dissatisfied with Brendle's service practices, which they considered to be unsafe.

Holding that the noncompetition agreement under the facts of this particular case was not enforceable because the evidence did not establish the existence of a protectible interest on the part of Brendle nor did it establish a close or special relationship between Calhoun and Brendle's customers, while the restrictions imposed an undue hardship on Calhoun, the Supreme Court of Alabama decision is highlighted by the following findings and determinations:

After a careful review of the record, we hold that the evidence does not support a finding that Calhoun had obtained information rising to the degree of confidentiality required to support the finding of a protectable interest.

The burden is upon the person or entity seeking to enforce a contract which restrains a lawful trade or business to show that it is not void under § 8–1–1, Code, supra. Brendle has failed to carry that burden. It has not shown a protectable interest in its customer lists. In fact, the evidence it offered tended to show that over ninety percent of the businesses in the Montgomery area are its customers and that that information

is available to anyone by looking at fire extinguishers which bear its tags. It makes no effort to keep confidential its customer lists. These are in sight of anyone on its premises. One does not have an unfettered right to be free of competition in this country, and contracts which seek to restrain one in the exercise of his right to practice a lawful trade or profession are disfavored.

There is no evidence to support a finding that Calhoun developed a close or special relationship with Brendle's customers during his employment with Brendle. The undisputed evidence is that Calhoun was not Brendle's sole contact with any customer, and that he was not given a particular territory to service. ...

\* \* \* \* \* \*

Calhoun testified that some customers of Brendle knew his face and knew that he was a Brendle employee. Furthermore, he would occasionally talk to customers about fire extinguishers when he was asked questions about their fire equipment. This evidence alone does not support the finding of a close relationship. Rather, it shows that Calhoun's contacts were infrequent and irregular. Calhoun's sales work was incidental to his main duties of servicing fire equipment. He had no expense account and was not authorized to entertain customers on behalf of Brendle.

\* \* \* \* \* \*

Brendle testified that after high school (from which he did not graduate) he received approximately eleven weeks of fire equipment training in a technical school in the United States Air Force, through which he obtained a military specialization as a fireman. Calhoun learned to install and to service fire extinguishers, which became his principle duties while he was employed with Brendle. Additional training through the years he worked for Brendle was provided by the manufacturers of various fire systems whose schools Calhoun attended. The evidence supports Calhoun's contention that he would be irreparably harmed by enforcement of this non-competition agreement, which restraint would prohibit him from engaging in the only business for which he is trained and has experience. He has a wife and an infant daughter to support, and his attempts at other ventures have been unsuccessful.

509 So.2d at 692–694.

The facts of the Calhoun-Brendle case figuratively shout their difference to the [almost] undisputed facts of the case at bar.

The third and final case urged by defendant's counsel to be supportive of a denial of the preliminary injunction sought by Redstone Paper Co. is *Mason Corporation v. Kennedy*, 286 Ala. 639, 244 So.2d 585 (1971). Here a former employer sought temporary and permanent injunctive relief against its former employee's violation of a noncompetition clause (with five year restriction) in an employment contract and also damages for its breach. The trial court entered judgment denying the relief prayed for and the former employer appealed.

The facts of *Mason Corporation v. Kennedy* stated by the Supreme Court of Alabama are as follows:

Appellee Kennedy was employed by Mason as the exclusive sales representative covering the Tennessee-Kentucky territory from January 5, 1959 to June 30, 1967.

In 1966 certain of Mason's employees left the firm and formed a competing company, Perfection Metal & Supply Company. Immediately thereafter, Mason entered into "noncompetition" employment agreements with its remaining salesmen, including Kennedy, whereby the salesmen agreed not to compete with Mason or solicit its customers, etc., in the territory covered for Mason for a period of five years after termination of employment with Mason.

Kennedy continued to work for Mason under the noncompetition agreement until 1967, when he was fired for his failure to produce adequate sales. Upon termination Kennedy received all salary and other benefits accrued to him with the

exception of a certain portion of his reserve account in a Profit Sharing Trust held in escrow pending a legal action.

Kennedy received on June 11, 1986 a lump sum payment representing the amount in his reserve account to which he was entitled ' and at that time he signed another noncompetition agreement with Mason which prohibited him from competitive employment for three years from the date he was fired. It is clear from the evidence that Kennedy understood the provisions and obligations of both agreements.

After being terminated by Mason, Kennedy was employed by General Electric Supply Co. as a salesman in the Birmingham area. His salary was $600.00 per month plus commissions which during his first year amounted to $500.00 over his salary. Kennedy voluntarily left the Electric Company and on November 1, 1969, was employed by Perfection on a draw of $700.00 per month to be charged back to his commissions. At the time of trial his commissions had not equaled his draw and he was indebted to the company.

Kennedy was assigned to cover the Tennessee-Kentucky area for Perfection, the same area he had covered while employed by Mason. Other territories were available, but Kennedy was not offered these. Between November 24, 1969 and the trial date Kennedy made sales totaling $12,445.94 to customers he had formerly contacted for Mason.

244 So.2d at 587–588.

In this case the Alabama Supreme Court held that the trial court did not abuse its discretion in denying injunctive relief to the employer to enforce the noncompetition covenant of plaintiff's former employee *who for two years and four months after he was fired by plaintiff did not engage in a business competitive with his former employer, Mason Corporation.* This two year four month observance by the defendant former employee of his noncompetition covenant to the Mason Corporation, together with the fact that a new salesman could be trained by his former employer in his old territory within a year and a half,

standing alone distinguishes the facts of that case. Moreover, the fact that the Mason Corporation required Kennedy to sign a second noncompetition agreement *after he was terminated before he would be paid lump sum benefits under a Profit Sharing Trust* (emphasis in original) was highlighted by the Supreme Court of Alabama in its opinion of affirmance. Lastly, the following concluding language of the *Mason Corporation v. Kennedy* opinion is most significant in an analysis of the precedential weight this cited case should be accorded in a proper determination of the issues before this Court:

> We hold that a court of equity has the power to enforce a contract against competition although the territory or period stipulated may be unreasonable, by granting an injunction restraining the respondent from competing for a reasonable time and within a reasonable area.

> We cannot say that the trial court was palpably wrong here in finding that Kennedy, by not competing with Mason for two years and four months, had voluntarily restrained himself for a reasonable period of time, thereby making an injunction unnecessary.

244 So.2d at 590.

## CONCLUSION

In sum, plaintiff Redstone Paper Co. is entitled to the issuance of a preliminary injunction in this action restraining and enjoining defendant Terrell D. Hughes, pending a final hearing of this cause, from directly or indirectly competing with Redstone Paper Co. in its trade area of Madison, Morgan and Limestone Counties in the State of Alabama and Bedford, Coffee, Franklin, Giles and Lincoln Counties in the State of Tennessee and from working for a competitor of Redstone Paper Co. in such referenced Alabama and Tennessee Counties, and from directly or indirectly using and/or utilizing or permitting or allowing others to use and utilize in such referenced Alabama and Tennessee counties those certain confidential trade secrets of Redstone Paper Co. being in the form of price and pricing lists of Redstone Paper Co. reflect-

ing the cost price of each item offered for sale by Redstone Paper Co. and the company recommended sales price of each such item. Prior to the actual issuance of the preliminary injunction above referenced plaintiff Redstone Paper Co. shall file in the office of the Clerk of the Court proper security for the issuance of such injunction corporate surety bond in principal amount of Fifty Thousand ($50,000.00) Dollars, conditioned as required by law for the payment of such costs and damages as may be incurred or suffered by defendant Terrell D. Hughes being found to have been wrongfully enjoined or restrained. Such bond must be approved by the Clerk.[6]

An appropriate preliminary injunction order shall issue.

## APPENDIX

### SALES AGREEMENT CONTRACT

This agreement made on this the 8th day of April, 1985, by and between REDSTONE PAPER COMPANY, hereinafter called Employer, and Terrell O. Hughes, hereinafter called Employee.

In consideration of the above premises, the mutual covenants of the parties, and the sum of $1.00 paid each to the other, receipt of which is hereby acknowledged, the parties do hereby agree as follows:

Employer does hereby hire Employee as a salesman to sell and distribute merchandise for Employer to Employer's customers and accounts that are now existing or may be acquired in the future.

It is agreed and understood that Employee will become acquainted with confidential records and files for the Employer, and as a result of this confidential information that will come to his attention, Employee agrees and promised that upon termination of his employment with the Employer he will not compete with Employer in Employer's trade area or work for a competitor, for a period of one year from date of termination. In event of termination of employment, Employee agrees and promises to return to Employer all records, price books, samples and anything else pertaining to the Employer.

Employee further agrees and promises that he will not divulge to anyone any of Employer's information concerning customer's account or any other information concerning Employer's business.

WITNESS: _Beady Duggin_

DATE: _4/8/85_

SIGNED: _J. B. Smith_
(For Redstone Paper Co.)

DATE: _4/8/85_

SIGNED: _Terrell D. Hughes_
(EMPLOYEE)

DATE: _4/8/85_

### AGREEMENT

In consideration of my employment and continued employment by the Mead Merchants division of The Mead Corporation, an Ohio corporation ("MEAD"), and in consideration of the compensation paid me during my employment by MEAD, I agree that:

1. I have no contract, agreement, claim or obligation which may be in conflict with any obligation I have undertaken under this Agreement.

2. Except as my assigned duties may require or as MEAD may otherwise consent in writing, I will not disclose at any time either during or subsequent to my

**6.** In its oral order of August 10, 1987 entered of record at the close of the hearing the Court announced that the application for preliminary injunction was granted and would be effective at the time plaintiff filed corporate surety bond in principal amount of $50,000 in conformity with Rule 65(c), Fed.R.Civ.P., and was approved by the Clerk. The requisite bond was filed and approved on August 11, 1987 at 10:26 a.m.

employment, any information, knowledge or data of MEAD which I may develop or receive during the course of my employment relating to financial data, writings, computer software, sales policies, customer information, conceptions, inventions, trade secrets, sources of supply, know-how, plans and programs, or other knowledge of MEAD's which is of a proprietary or confidential nature (the "Information"); and I will deliver to MEAD upon termination of my employment all documents, equipment and other records of such information, knowledge or data.

3. In the course of my employment I will learn of and hopefully will conceive MEAD Information during MEAD time and at MEAD expense, which Information relates to MEAD interests and is likely to be of benefit both to MEAD's competitors and to MEAD even after termination of my full time employment. I recognize a just purpose in MEAD's protecting its investment in that Information and related training and experience afforded me at MEAD's expense. I also recognize a just purpose in MEAD's effecting such protection through continued use of my knowledge and judgment and though avoiding, for limited times, competition by, through and from former employees trained and/or given special knowledge, contracts and/or experience by MEAD in MEAD's line of business and with MEAD's equipment, designs, methods, processes, contacts, data, know-how and money. Accordingly, and with full knowledge that Mead will rely on this agreement in employing me or in continuing to employ me, I agree that:

a) during my employment and for one year after the termination of my employment, I will not either directly or indirectly divert or aid others in diverting any trade which MEAD was enjoying at the time of such termination or which I had solicited on MEAD's behalf during the last six months of my employment at MEAD;

b) during my employment and for one year after the termination of my employment I will not own, manage, control or operate, or act as an employee, sales representative, sales executive, consultant or independent contractor of, any business which sells, delivers or deals in any of the products of the Mead Merchant Division, or substantially similar products, within seventy-five miles of any Mead Merchant location within the Mead Merchant Southern Area to which I have been assigned at any time during my employment.

c) during my employment and for two years after the termination of my employment, I will not either directly or indirectly entice, aid or cooperate with others in soliciting or enticing any MEAD employee to leave MEAD's employ for other employment;

d) without limiting the term of my general obligation to honor MEAD's confidential and trade secret information for so long as it remains protectable, I specifically agree that during my employment and for one year thereafter, I will accept no employment wherein the performance of the duties and responsibilities of the new employment will call upon me to use, to disclose or to base judgments upon the confidential or trade secret information of MEAD, or to utilize the good will of MEAD in making sales for a competitor of MEAD.

4. In the event that any word, phrase, clause, sentence or other provision hereof shall violate any applicable statute, ordinance or rule of law in any jurisdiction in which it is used, such provision shall be ineffective to the extent of such violation without invalidating any other provision hereof. It is further agreed that if at any time it shall be determined this covenant is unreasonable as to time or area, or both, by any court of competent jurisdiction, Mead shall be entitled to enforce this covenant for such period of time and within such area as may be determined to be reasonable by such court.

5. I further agree that upon the termination of my employment with Mead Merchants, whether such termination is voluntary or involuntary, my right to receive any commissions payable shall cease upon the date of such termination and that I shall be entitled to receive only commissions for orders which have been shipped and billed as of the date of such termination.

6. I further agree that in the event of any breach of this covenant that Mead's injuries are irreparable and that Mead shall be entitled to injunctive relief, in addition to such other and further relief as may be proper. In the event of my breach of this covenant, or any part thereof, I agree to pay all costs of enforcement of said covenant, including, but not limited to, reasonable attorney's fees.

7. I have read this agreement before signing it and I acknowledge receipt of a copy.

**Signed By:**

_____
**Mead Merchant Representative**

_____
**Title of Position**

_____
**Employee's Signature**

on _____, 19___
   **month**      **day**      **year**

---

## PRELIMINARY INJUNCTION ORDER

In conformity with the findings of fact and conclusions of law contained in the Memorandum of Decision this day entered in the above entitled civil action, adopted as part of the within Order, it is

ORDERED, ADJUDGED and DECREED that defendant Terrell D. Hughes in his capacity as a sales representative of the Mead Merchants division of The Mead Corporation or otherwise be and he hereby is RESTRAINED and ENJOINED, under pain of penalty, from directly or indirectly competing with plaintiff Affiliated Paper Companies, Inc. d/b/a Redstone Paper Company and from working for a competitor of the plaintiff company in the Redstone Paper Company trade area consisting of Madison, Morgan and Limestone Counties in the State of Alabama and Bedford, Coffee, Franklin, Giles and Lincoln Counties in the State of Tennessee and from using and/or utilizing in his capacity as a sales representative of the Mead Merchants division of The Mead Corporation, or otherwise, in the above referenced Redstone Paper Company trade area the trade secrets of Redstone Paper Company consisting of its price and pricing lists showing exact cost of each item offered for sale by Redstone Paper Company and recommended sales price of each item, pending the final hearing in the above entitled cause.

The within injunction is retroactive to August 11, 1987 at 10:26 A.M., being the time and date corporate surety Preliminary Injunction Bond was filed herein by plaintiff Affiliated Paper Company, Inc. d/b/a Redstone Paper Company in conformity with order of this Court and approved by the Clerk of the Court, being in principal amount of Fifty Thousand ($50,000.00) Dollars, naming defendant Terrell D. Hughes as the obligee therein and being conditioned as required by Rule 65(c), Fed.R. Civ.P.